## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDWARD** and **KATHLEEN** **OSTROSKI**, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 2:18cv947 |
| | ) | **Electronic Filing** |
| **CHESAPEAKE APPALACHIA,** **L.L.C., CHESAPEAKE OPERATING,** **L.L.C.**, and **CHESAPEAKE ENERGY** **CORPORATION**, | ) ) ) ) ) | |
| Defendants. | ) ) | |

### MEMORANDUM OPINION

November 18, 2019

## I.    INTRODUCTION

Plaintiffs, Edward Ostroski and Kathleen Ostroski (the "Ostroskis" or "Plaintiffs")

initiated this action against Defendants, Chesapeake Appalachia, LLC ("ChesApp") and two (2)

related companies, Chesapeake Operating, LLC ("ChesOp") and Chesapeake Energy

Corporation ("CEC")(together the "Chesapeake Defendants") by filing a Complaint to Vacate

Arbitration Award.  The Ostroskis filed an Arbitration Complaint and Demand against the

Chesapeake Defendants alleging the underpayment of natural gas royalties under a Paid-Up Oil

and Gas Lease they entered into with ChesApp. After the filing of cross motions for summary

judgment, the arbitrator entered a Final Award in favor of the Chesapeake Defendants. By their

Complaint, the Ostroskis now seek to vacate the Final Award.

## II.    STATEMENT OF THE CASE

On or about September 15, 2007, the Ostroskis entered into a Paid-Up Oil and Gas Lease (the "Lease") with ChesApp pursuant to which the Ostroskis leased oil and gas rights to real property in Bradford County, Pennsylvania. Plaintiffs' Appendix ("Pl. Appdx.") Ex. 9, p. 191. The Lease provides for a royalty payment for natural gas as follows:

> (B)   ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold as follows . . .

> (2)   GAS:  To pay Lessor an amount equal to one-eighth (1/8) of the revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. . .

Pl. Appdx. Ex. 12, pp. 214-215.  Plaintiffs contend that ChesApp breached the lease by paying the royalties on the wrong price. Complaint ¶ 19.

Plaintiffs admit that ChesApp is a gas producer, not a gas marketer. ChesApp Resp. Ex. 2 ¶ 9.  In order to market its gas, ChesApp transfers title to the raw gas at the well to its gas marketing affiliate, Chesapeake Energy Marketing, L.L.C. ("CEM")[1]. Complaint ¶ 20, ChesApp Resp. Ex. 2 ¶ 10. CEM processes the raw gas into marketable natural gas and markets the processed gas to third-party buyers in downstream markets. *Id.*

In a letter to Plaintiffs describing how it markets its gas, CEC stated as follows:

> By way of background, gas produced from the Lease is in marketable form at the well, and is sold by [ChesApp] to [CEM] at this point. [CEM] is a marketing company, which takes title to and possession of gas at the well and aggregates it with gas from multiple other wells into a downstream pool typically on an interstate pipeline. The volume of natural gas aggregated in this pool is then sold to many different buyers, at different prices. On a monthly basis, [CEM]

---

[1]    Plaintiffs assert that although ChesApp contends it sells the gas to CEM, there is no sale because CEM pays no consideration to ChesApp. The only "revenue realized" from the sale of the gas is the amount paid by third party buyers. ChesApp Resp. Ex. 2 ¶ 11.

determines a weighted average sales price for the gas sold from the pool at the downstream, value-added points of sale. The weighted average sales price is calculated by averaging the price received from the individual sales from this pool across the entire volume contained in the pool. [CEM] pays [ChesApp] 97% of this weighted average sales price ([CEM] retains a 3 percent marketing fee which is born solely by [ChesApp] and is not passed on to the Lessor), less costs [CEM] incurs between the point of sale at the well and the downstream points of sale. The costs incurred by [CEM] are itemized in your royalty statement.

ChesApp Resp. Ex. 2 ¶ 14.

Plaintiffs argue that ChesApp is calculating the royalties based upon a "theoretical well head price, calculated as the price paid by the third-party buyers less the costs incurred by [CEM] between the well and the sale to the third-party, including the costs of gathering, compression and interstate transportation through the interstate pipeline system[,] but should be paying royalties on the price paid by the third-party buyers. Complaint ¶ 21 (incorrectly written as ¶ "15").

Plaintiffs contend that they are entitled to royalties based upon the gas produced and sold to third-party buyers without deduction costs. The arbitrator disagreed and entered a Final Award in favor of the Chesapeake Defendants.

## III.    LEGAL STANDARD FOR REVIEW OF ARBITRATION AWARD

Under the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 1, *et seq.*, review of an arbitration award is quite narrow. *Akers National Roll Co. v. United Steel, Paper and Forestry, Mfg., Energy, Allied Industrial and Services Workers International Union*, 712 F.3d 155, 160 (3d Cir. 2013). The role of the court is not to review the merits of the decision or correct factual or legal errors. *Dauphin Precision Tool v. United Steelworkers of America*, 338 Fed. Appx. 219, 222 (3d Cir. 2009). Instead, appellate courts have emphasized the very deferential role that courts have in reviewing arbitration awards. *Pennsylvania Power Co. v. Local Union No. 272 of*

*the International Brotherhood of Electrical Workers, AFL-CIO*, 276 F.3d 174, 178 (3d Cir. 2001) *see also Akers Nat'l Roll Co.*, 712 F.3d at 165 ("The *sine qua non* of judicial review of an arbitration award is a heavy degree of deference to the arbitrator.").

The federal policy of encouraging arbitration of contract disputes essentially has given rise to "a strong presumption in favor of the [arbitrator's] award." *Newark Morning Ledger Co. v. Newark Typographical Union Local 103*, 797 F.2d 162, 165 (3d Cir. 1986). This presumption generally can be overcome "only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop." *Akers National Roll Co.*, 712 F.3d at 160 (quoting *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir.1969)). "In other words, an award may be set aside when an arbitrator manifested a disregard of his authorization, and instead 'dispense[d] his own brand of industrial justice.'" *Pennsylvania Power Co.*, 276 F.3d at 179; *see also Exxon Shipping Co. v. Exxon Seaman's Union*, 73 F.3d 1287, 1291 (3d Cir. 1996) ("[W]e must enforce an arbitration award if it is based on an arguable interpretation of the collective bargaining agreement, and we may only vacate an award if it is entirely unsupported by the record or if it reflects a 'manifest disregard' of the agreement.").

Despite the highly deferential language, the court's role is not simply to "rubber stamp" the arbitrator's decisions. *Matteson v. Ryder System, Inc.*, 99 F.3d 108, 113-14 (3d. Cir. 1996); *see Leed Architectural Prods., Inc. v. United Steelworkers of America, Local 6674*, 916 F.2d 63, 65 (2d Cir. 1990) ("This great deference, however, is not the equivalent of a grant of limitless power."). A district court may vacate an arbitration award if, *inter alia*, "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). In addition to the manifest disregard of the agreement, the arbitrator's manifest disregard of the law also provides a basis for disturbing an award. *United Transp. Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376,

379 (3d Cir. 1995). Unless the arbitrator's award fails to "draw its essence" from the parties' CBA — such that there is "absolutely no support at all in the record justifying the arbitrator's determinations" — the Court must enforce the award reached through arbitration. *United Transp. Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 379 (3d Cir. 1995).

"'[I]f an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision.'" *Akers Nat'l Roll Co.*, 712 F.3d at 160 (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)). To vacate, a court must find that the arbitrator's award "ignore[s] the plain language of the contract." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987).

## IV.    DISCUSSION

The Plaintiffs argue that the arbitrator in this case "clearly strayed from interpretation and application of the oil and gas lease at issue and effectively dispensed her own brand of industrial justice." Complaint ¶ 17. Specifically, Plaintiffs contend that:

(1)    The Lease requires that the royalties be paid on gas that is both "produced and marketed." Therefore, because ChesApp does no marketing, the royalties must be paid on the price received by CEM for the gas marketed to third-party buyers;

(2)    The Lease requires that the royalties be paid on the "revenues realized," and because CEM makes no payment to ChesApp[2], the only revenues realized are those paid by the third-party buyers;

_____

[2]    CEC, the parent company, instead, records an accounts receivable on a general ledger showing a debt owed by CEM to ChesApp.

5

(3)    No costs can be deducted from the price paid by the third parties because the royalties must be paid on "marketed" gas and on "money obtained". Moreover, all costs are incurred by CEM, not ChesApp, the lessee; and

(4)    The Gist of the action doctrine does not bar Plaintiffs' conversion claim against the Chesapeake Defendants because a natural gas royalty is a property interest subject to conversion.

Essentially, these are the same arguments offered, and rejected, at arbitration.

The Arbitrator also identified, and upheld, the Chesapeake Defendants' arbitration contentions:

(1)    ChesApp's sale to CEM is a valid sale, and therefore, ChesApp pays royalties in accordance with the Lease;

(2)    The language "marketed and sold" in the royalty clause dies not impose a duty to market and even if it did, ChesApp's sale to an affiliated marketing company satisfies the clause;

(3)    Under the contract with CEM, ChesApp receives 97% (after deduction of 3% marketing fee) of what third parties pay to CEM less CEM's costs;

(4)    In Pennsylvania, sales between affiliates are valid and enforceable, unless a party can pierce the corporate veil; and

(5)    A breach of contract action is not separately actionable as a standalone tort claim for conversion against the Chesapeake Defendants and is barred by the gist of the action doctrine.

As set forth above, this Court's review is extremely narrow, and it is not our role to review the merits of the decision or correct factual or legal errors. After a comprehensive review of the Lease, the Award and the Record in this case, this Court finds more than adequate support in Lease for the rulings of the arbitrator.  Clearly, there was no manifest disregard of either the

Lease, or the law, in the arbitrator's award. *See United Transp. Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d at 379. Moreover, the Court can find no support in the record for Plaintiffs' contention that the arbitrator "clearly strayed from interpretation and application of the oil and gas lease at issue and effectively dispensed her own brand of industrial justice." Accordingly, Plaintiffs' request that the Court vacate the arbitration award will be denied.

**V.    CONCLUSION**

Based on the foregoing, the Ostroskis' Complaint to Vacate Arbitration Award shall be denied. An appropriate Order follows.

s/ DAVID STEWART CERCONE
David Stewart Cercone
Senior United States District Judge

cc:    David A. McGowan, Esquire
       Justin H. Werner, Esquire
       Kevin C. Abbott, Esquire

       (*Via CM/ECF Electronic Mail*)

7